# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| JEFFREY L. GIRTEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:09 CV 151  PPS |
| | ) | |
| TOWN OF SCHERERVILLE, ROBERT | ) | |
| VOLKMANN, individually and in his | ) | |
| capacity as a Town of Schererville official, | ) | |
| JEFFREY HUET, individually and in his | ) | |
| capacity as a Town of Schererville official, | ) | |
| and AL LEWANDOWSKI, individually | ) | |
| and in his capacity as a Town of | ) | |
| Schererville official, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Jeffrey Girten brought this action against his former employer, Defendant Town of Schererville, and his former supervisors, Al Lewandowski, Jeffrey Huet, and Robert Volkmann (I refer to the Defendants collectively as "Schererville" or "the Town"), after the Town terminated Girten's employment following sixteen years on the job.  In his complaint, Girten claims he was fired because he engaged in constitutionally protected speech, in violation of 42 U.S.C. § 1983 and the First Amendment, and because he's diabetic, in violation of the Americans with Disabilities Act.  Before the Court is Schererville's motion for summary judgment.  [DE 41.]  For the following reasons, the motion is **GRANTED** as to the First Amendment claim but **DENIED** as to the ADA claims, however, the ADA claims against the individual defendants are **DISMISSED**.

## FACTUAL BACKGROUND

First the facts.  Notably, many of the following facts are in dispute.  In some instances, I note the dispute, in others I state the facts as alleged by the non-moving party, Plaintiff Girten. In either case, I apply the facts in the light most favorable to Girten and draw all reasonable inferences in his favor.  *Carmichael v. Village of Palatine, Ill.*, 605 F.3d 451, 456 (7th Cir. 2010).

Girten was employed as a maintenance worker with the Town of Schererville Public Works Department from 1993 until his termination in 2008.  [DE 47 at 14.]  Among his duties, Girten was responsible for repairing mailboxes that were damaged by Schererville snow plows during the winter months.  [*Id.*]  During the period relevant to this suit, Girten was supervised by Defendant Al Lewandowski, a general foreman in Public Works.  [*Id.* at 8-9.]  Lewandowski reported to Defendant Jeffrey Huet, the Director of Public Works, who reported up the chain of command to Defendant Robert Volkmann, Schererville Town Manager.  [*Id.*]  As Town Manager, Volkmann made final decisions regarding hiring and firing Public Works personnel. [DE 52-1 at 24-25.]

Girten has Type I diabetes.  [DE 52.]  Girten's diabetes requires him to draw blood at least four times a day to check his blood sugar levels, take at least two insulin shots a day, and strictly regulate his eating.  [DE 47-1 at 18.]  Schererville officials were aware of his diabetes at the time he was hired, and the Town accommodated his diabetes by permitting Girten to store insulin and extra food in a refrigerator at the Town garage.  [DE 52 at 17-18.]  From the time he was granted this accommodation until March 2008, Girten's diabetes had never been an issue on the job, and he never requested that his job duties be altered or changed because of his diabetes.

[*Id.* at 18.]  And Lewandowski never had any problems with Girten or his work during that period.  [DE 52-3 at 11 (Lewandowski Dep.).]  Girten had significant freedom in choosing his daily work assignments and pacing their completion.  [*Id.* at 14.]

According to Girten, everything changed on March 3, 2008.  [DE 47 at 14.]  On that day, Girten was in the Town garage when he noticed Town employees Tom Poleski and Brad Keene, along with Lewandowski, working on a car's engine in the mechanic shop.  [DE 52-2 at 57.]  Girten asked Poleski whose engine it was, and Poleski told him it was Keene's.  [*Id.*]  Girten then asked Poleski, "if my Sierra truck's transfer case went out, would I be able to bring it in and have the same work done on it?"  [*Id.* at 58.]  Girten claims he was being sarcastic.  Poleski told Girten he doubted it and then told Lewandowski what Girten had said.  Lewandowski walked over to Girten and told him, "he will never get this kind of treatment, don't even ask."  [*Id.* at 59.]  According to Girten, Lewandowski seemed upset with him for raising the issue.  Girten testified that he felt it was unfair that Keene and Lewandowski were "defrauding the taxpayers of money" by using Town resources for personal use.  [*Id.* at 60.]  Notably, the Public Works Personnel Manual proscribed the unauthorized use of Town equipment.  [DE 52-5 at 6.]  But, aside from his comment to Poleski, Girten did not report the engine issue to anyone at the Public Works Department.  Keene's engine had been in the Town garage from January to the middle of March.  [DE 52-1 at 40.]

Following the March 3 incident, Girten claims his relationship with Lewandowski, which previously had been good, quickly deteriorated.  [DE 50-3 at 129.]  Girten testified that all of a sudden the workplace became "hostile and non harmonious."  [*Id.*]  He felt like "whatever I did was not good enough for [Lewandowski]."  [*Id.* at 129-30.]  Because of this, Girten claims his

stress level increased substantially. [*Id*. at 131-32.] In fact, according to Girten, the stress associated with the March 3 incident and Lewandowski's reaction to it made it difficult for Girten to successfully regulate his blood sugars. [*Id*. at 131.]

Unfortunately for Girten, this corresponded with a substantial uptick in his workload. Girten testified that he fixed between 55 and 70 mailboxes in a typical winter. [DE 52-2 at 27.] But in the winter of 2007 and 2008, 150 mailboxes needed fixing – the highest number in his sixteen years working for the Town. [*Id*. at 26.] Given the excessive workload, in January 2008, Girten requested additional workers to help fix the broken mailboxes. [*Id*. at 28.] Girten claims that he told Lewandowski and Huet that he could not possibly fix all 150 by himself, and that he would need an entire crew of workers. [*Id*. at 28, 33, 36.] In response, Lewandowski gave him one person to help, though the worker was inexperienced and the additional help only lasted one day. [*Id*. at 29.] After that, Girten proceeded on his own. [*Id*.] By March 2008, the mailbox repairs became a serious source of stress for Girten. [*Id*. at 36.]

On March 28, 2008, Huet met with Lewandowski, and he directed Lewandowski to make sure that Girten made progress on the broken mailboxes. [DE 52 at 5.] Three days later, Lewandowski bumped into Girten in the Town garage, and he asked Girten how the mailbox repairs were coming along. The two then got into a discussion about which mailboxes Girten was responsible for fixing. According to Lewandowski, the conversation "wasn't real heated."[1] [DE 52-3 at 10-11.] Nonetheless, Lewandowski ordered Girten to fix all the mailboxes, stating, "[if you're not going to work on the mailboxes, don't come to work tomorrow." [*Id*. at 9.]

---

[1] In its brief, the Town claims that Girten "went into a tirade" at the March 31 meeting [DE 52 at 6], but this claim is unsupported by the record.

Lewandowski again offered Girten an additional worker to help fix the mailboxes. [DE 52-6.] According to Girten, prior to this discussion he had no time-line for fixing the mailboxes, and he did not believe the repairs were urgent. [DE 50-2 at 49-50.]

Here's where the parties disagree. Lewandowski claims that Girten responded to his order to immediately fix the mailboxes by "just flat out stating, I'm not doing them." [DE 52-3 at 8.] But Girten testified that he never told Lewandowski that he would not fix the mailboxes, instead responding, "Okay, I will fix the mailboxes." [DE 52-2 at 39.] Lewandowski, who was in charge at the time because Huet was on vacation, called Huet after the conversation and told him that Girten refused to fix the mailboxes.

The next day Girten didn't come to work. He claims he took a personal day because his blood sugar count was 350, which is extremely high. (It should have been around 150.) [DE 52-2 at 42.] According to Girten, his blood sugars had never been that high in his sixteen years working for Schererville. [*Id*. at 43.] He claims he was stressed out because of the mailboxes and his discussion with Lewandowski, and this adversely affected his blood sugar. [*Id*. at 36.] Girten called his doctor, Dr. Mark Rybczynski, who told him to take extra units of insulin, and this temporarily brought his blood sugar count back to normal levels. [*Id*. at 44.] Yet, according to Lewandowski, by failing to report to work on April 1, Girten demonstrated that he "obviously [] didn't want to put up the mailboxes." [DE 52-3 at 13.]

Girten returned to work on April 2. When Girten punched in, he was called to a meeting with Lewandowski and another Town employee, Chip Bell. [DE 52-2 at 44-45.] Before entering the meeting, Girten checked his blood sugar level and it was "sky high." [*Id*. at 45.] At the meeting, Lewandowski instructed Girten (among other things) to immediately fix all 150

broken mailboxes.  [*Id*. at 46.]  According to Girten, he responded by telling Lewandowski that he couldn't do it.  Specifically, Girten told Lewandowski: "My blood sugars are outrageously high.  I need more help on this job.  I cannot do it all myself."  [*Id*. at 47.]  Girten testified that he thought that he was being treated unfairly.  [*Id*. at 48.]  In addition, Girten told Lewandowski, along with other employees in the area, that he was going to report the March 3 engine incident as an unauthorized use of Town property; he warned them that they better get a good lawyer. [*Id*. at 51.]  Girten then told Lewandowski to fix the mailboxes himself, punched out, and left work.  [DE 52-6.]  Girten acknowledges that he "blew off some steam" and probably shouldn't have threatened to bring a lawsuit.  [DE 52-2 at 49-51.]  Later that day, Lewandowski spoke with Volkmann about what happened and drafted a memo to Huet recommending Girten's termination for insubordination.  [DE 52-3 at 28.]

After leaving Public Works that morning, Girten wrote down what happened on March 3, March 31, and April 2, and went to the Schererville police station to make an official report.  [*Id*. at 52-54.]  Girten then called Volkmann and told him about the broken mailboxes, his discussion with Lewandowski, and his health.  [DE 50-2 at 71-72.]  Girten explained to Volkmann that he was unable to work because his blood sugars were too high.  [*Id*.]  According to Girten, Volkmann responded by telling him, "Don't worry about it, you take care of your health.  You are covered under the ADA for your missed days."  [*Id*.]  Volkmann, however, did not recall discussing diabetes, blood sugar levels, or the ADA, but he did remember Girten saying that he was going to see his doctor.  [DE 52-1 at 9-10.]  Moreover, Volkmann recalled speaking with Girten in person rather than on the telephone.  [*Id*. at 8.]  He testified that Girten "was visibly agitated" and insisted "that he wasn't fixing the mailboxes."  [*Id*.]

On April 3, Girten called in sick, explaining that he talked to Volkmann and the days were covered by the ADA. [DE 52-2 at 55.] The next day, Girten saw Dr. Rybczynski about his blood sugar. Girten explained to Rybczynski his work situation, his increased stress, and his high blood sugar levels. [*Id*. at 72.] Rybczynski diagnosed Girten with an anxiety disorder and prescribed an anti-depressant. He also increased Girten's insulin dose. [DE 47-1 at 17.] Rybczynski then cleared Girten to return to work without any restrictions. [DE 52-2 at 73-75.] According to Rybczynski, stress commonly causes blood sugar counts to increase. [DE 47 at 18.]

On April 4, Huet returned from vacation, and Lewandowski met with Huet about his conversations with Girten and Girten's refusal to fix any mailboxes on April 2. [DE 52-1 at 33.] Notably, Lewandowski testified that he did not know the total number of mailboxes that needed repair when he met with Huet, and admitted that if he had known the actual number was so high, he "might have offered [Girten] help from the get-go." [DE 52-3 at 23.] Nonetheless, Lewandowski recommended terminating Girten for insubordination. [DE 52-3 at 28.] Huet then wrote a memo to Volkmann recommending that Volkmann fire Girten for "flat out refusal to do the job he was being assigned to do." [DE 50-1 at 66.] Huet never discussed the situation with Girten, instead relying solely on his conversations with Lewandowski and other Town employees. [*Id*.]

On the same day, Lewandowski and Keene admitted to Huet that they had used Town facilities without authorization by working on Keene's engine in the Town garage. [DE 52-1 at 39.] As a result, Huet reprimanded Keene for unauthorized use of Town equipment, and he reprimanded Lewandowski and Bell for allowing the unauthorized use of Town equipment. But

none of the Town employees were specifically disciplined for failing to report the violation, despite the fact that the engine had been openly stored in the Town garage for over two months. Huet suspects that Lewandowski and Keene confessed to the violation because they feared Girten would tell on them. [DE 54-1 at 42-43.]

On April 8, Girten reported back to work and was immediately called into a meeting with Huet and Volkmann. [DE 50-3 at 101.] At the meeting, Girten explained that he was under a lot of stress and the stress adversely affected his blood sugars. [*Id*. at 102.] He told them that with his blood sugar in the 350 to 400 range it would be unsafe for him to drive or otherwise do his job. [*Id*.] He also explained the issues he was having with Lewandowski. [*Id*.] He then gave them a note from his doctor, which said that he was suffering from high blood sugars and an anxiety disorder, but that he was ready to return to work. [*Id*. at 103] Girten testified that "[t]hey both looked it over, and none of them wanted it." [*Id*.] They then told Girten to wait outside. According to Girten, when they called him back into the office, Volkman told Girten, "Well, because of your health and because of your insubordination that you have here with the Town, the Town of Schererville is no longer the place for you to be." [*Id*. at 103-04.] Volkmann testified that he never told Girten that he was fired because of his health. [DE 54-3 at 9.] According to Volkmann, he decided to fire Girten during that meeting. [*Id*. at 10.]

Girten filed a charge with the EEOC alleging that he was fired because of his health. He then brought this action claiming that he was wrongfully terminated (1) because he engaged in constitutionally protected speech by reporting the unauthorized use of Town property on March 3 and (2) because of his diabetes in violation of the Americans with Disabilities Act. In this motion, Schererville moves for summary disposition of these claims.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id*. at 248. In making this determination, I must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv.*, *Inc.,* 169 F.3d 494, 497 (7th Cir. 1999).

## I.      First Amendment Claim

Girten alleges that he was wrongfully terminated because of a comment he made to fellow Town employee, Tom Poleski, on March 3, 2008. After learning that Lewandowski and others were using town equipment for personal reasons – the repair of another employee's car engine – Girten asked Poleski, "if my Sierra truck's transfer case went out, would I be able to bring it in and have the same work done on it?" [DE 52-2 at 58.] When Lewandowski found out about his comment, Lewandowski told Girten "he will never get this kind of treatment, don't even ask." [*Id*. at 59.] Girten alleges that following this incident, Lewandowski had it out for him. Indeed, according to Girten, less than a month later when Lewandowski was in charge,

Lewandowski recommended Girten's termination in a memo to Huet just hours after Girten warned Lewandowski to "lawyer up" because he was going to report the violation. As a result, Girten argues that the Town retaliated against him for engaging in constitutionally protected speech on March 3, 2008. [2]

The First Amendment prohibits governmental retaliation against public employees for engaging in protected speech. *Gross v. Town of Cicero*, 619 F.3d 697, 703-04 (7th Cir. 2010). In determining whether a plaintiff can recover under a § 1983 First Amendment retaliation claim, I must determine whether the speech was constitutionally protected, was a but-for cause of the employer's actions, and whether the employee suffered a deprivation because of the employer's actions. *Id.*; *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 501 (7th Cir. 2010). If the speech is not constitutionally protected, there is no need to proceed to step two of the inquiry. *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007). To be constitutionally protected, the employee must have spoken as a private citizen on a matter of public concern. *Valentino v. Vill of S. Chi. Heights*, 575 F.3d 664, 671 (7th Cir. 2009). Whether speech is protected is a question of law for the court. *Spiegla*, 481 F.3d at 965.

The first question is whether Girten spoke as a private citizen or as a public employee when he made his comments on March 3. "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The parties vigorously dispute which side of the *Garcetti*

---

[2] Girten limits his First Amendment retaliation claim to the statements he made to Poleski on March 3. [*See* DE 47 at 6.]

line – private citizen versus public employee – Girten's speech falls. I need not answer the question definitively because it is clear that even if Girten was speaking as a private citizen, he wasn't speaking on a matter of public concern.[3]

In the context in which they were uttered, Girten's off hand comments on March 3 were not a matter of public concern. To determine whether a grievance is a matter of public concern I must look at the "content, form, and context" of the speech. *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). This inquiry involves determining whether the government employee sought to "bring to light actual or potential wrongdoing or breach of public trust." *Id.* at 148; *Bivens v. Trent*, 591 F.3d 555, 561 (7th Cir. 2010) ("[I]t is necessary to look at the point of the speech in question"). Though no one factor is dispositive, the content of the speech is the most important. *Gross*, 619 F.3d at 704. Notably, while an employee's personal stake in the subject matter of his speech does not necessarily remove the speech from the scope of public concern, "purely personal grievances do not qualify as matters of public concern." *Gross*, 619 F.3d at 704.

It would be hard to imagine that an off-the-cuff wise guy comment said to other workers in a workplace garage could somehow rise to the level of being about a matter of "public concern." Yet that is what Girten would have this Court find. In particular, Girten claims that his comment to Poleski had the high-minded intent to bring to light a breach of the public's trust by exposing the misuse of Town equipment and property. [DE 46 at 15.] At his deposition, he said that his concern was that Keene and Lewandowski were "defrauding the taxpayers of

---

[3] Relating to this issue, the Town moved to strike an errata sheet submitted by Girten after his deposition was taken which the Town says materially alters Girten's testimony on this subject. [DE 53.] But since I am relying on other grounds to deny the First Amendment claim, I need not address the motion. It is therefore **DENIED** as moot.

money" by using Town resources for personal use. [DE 52-2 at 60.] And he adds that even if he was partly motivated by personal concerns, this is irrelevant because he was also motivated in part to address a matter of public concern. *Citing Chaklos v. Stevens*, 560 F.3d 705, 714 (7th Cir. 2009) (noting that speech of public importance is only a matter of private concern when it is "motivated *solely* by the speaker's personal interests") (emphasis in original).

But while exposing misuse of government property certainly addresses a matter of public concern, *see Valentino*, 575 F.3d at 671-72, this is not dispositive. Indeed, "if the speech concerns a subject of public interest, but the *expression* addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern." *Bivens*, 591 F.3d at 561 (emphasis in original) (quoting *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994)). The question is "whether the context, form, and particular content (as opposed to the subject matter) of the speech indicate that [the plaintiff] complained for the purely private purpose of resolving a workplace issue." *Id*. Thus, the Seventh Circuit is clear that "the *content* of the speech" is what's important "not the inchoate intentions or views that the speaker privately holds." *Wernsing v. Thompson*, 423 F.3d 732, 752 (7th Cir. 2005) (emphasis in original) (internal citations omitted).

Here, the content of Girten's speech involves a purely private interest. Girten asked Poleski whose engine was being worked on in the Town garage, and then inquired, "if my Sierra truck's transfer case went out, would I be able to bring it in and have the same work done on it?" [DE 52-2 at 58.] So the "particular content" of Girten's comment was personal – he asked whether he would get the same treatment as another Town employee, not whether the use of Town equipment was authorized or a violation of Town rules. Girten claims he was being

sarcastic, and that his comment highlighted the unfairness of the situation. [*Id*. at 59.] But even so, his *actual expression* merely reflects the unfairness of the situation as it relates to him. *See Gross*, 619 F.3d at 705-06 ("content" involves the actual words, not some broader, unstated purpose); *Wernsing*, 423 F.3d at 752 ("[U]nprotected speech does not suddenly attain protected status simply because it is animated by a viewpoint which, if actually expressed, might itself merit First Amendment protection.").

Moreover, the two Town employees who heard his comment, Poleski and Lewandowski, certainly did not respond as if Girten's comment had a broader purpose. And what a listener thinks about the comment is "part of the calculus in determining whether a statement constitutes speech on a matter of public concern." *Gross*, 619 F.3d at 706; *see also Miller v. Jones*, 444 F.3d 929, 936 (7th Cir. 2006) ("[C]ommunication and content must connect in a way that creates a 'communicative element' putting the listener on notice that a matter of public concern is being raised."). Indeed, Poleski matter-of-factly responded to Girten's comment by stating that he doubted Girten would receive the same treatment (*i.e.*, Girten would not be able to bring his truck into the Town garage). After Girten's comments were relayed to Lewandowski, he likewise told Girten that "he will never get this kind of treatment, don't even ask." [DE 52-2 at 59.] And the parties left it at that.[4] This suggests that Girten failed to put the listeners on notice that he intended to highlight an issue of public concern through his expression. *See Schad v. Jones*, 415 F.3d 671, 676 (7th Cir. 2005) (finding the content of the speech a private concern where "[n]othing in Schad's speech could have alerted Knight, or anyone else, that a matter of

_____

[4] Lewandowski eventually told Huet about the engine, but only after Girten threatened to bring a lawsuit against him on April 2. This does not change the fact that Lewandowski did not believe that Girten's comment on March 3 was anything more than a personal grievance.

public concern was being raised."). So the content of Girten's speech suggests a purely personal grievance.

Similarly, the form of Girten's speech – a passing comment to a fellow employee – does not suggest that his expression was one of public import. *See Bivens*, 591 F.3d at 561 (internal report "suggest[s] that the grievance was personal in nature"); *cf. Valentino*, 575 F.3d at 672 (speech of public concern where employee spoke about government corruption to a member of the public who headed the group "Citizens Against Corruption").

Finally, I look to the context of Girten's speech to determine if a public component was "unstated" and "indirect." *See Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 379 (7th Cir. 2009) (context is important where "any reference to government waste was indirect and tangential"). When considering context, the speaker's motive and the circumstances surrounding the speech at issue are particularly relevant. *Miller*, 444 F.3d at 937; *Clarke*, 574 F.3d at 377.

The Seventh Circuit's recent decision in *Gross v. Town of Cicero* is instructive in this regard. 619 F.3d at 706. In *Gross*, the plaintiff argued that, despite the fact that his actual statements reflected purely personal concerns about his daughter's alleged sexual harassment, his speech had a broader, unstated purpose, which was to highlight other instances of harassment in the workforce, an interest of public concern. *Id.* at 705-06. But the Court held that "even if that were true, he never communicated [his broader purpose to the defendant] – in other words, his *speech* never conveyed more than his personal grievance." *Id.* at 706 (emphasis in original). Moreover, the Court did not find his broader purpose claim credible because the plaintiff "took no other corrective measures to address [the] allegedly systemic and heinous conduct" that supposedly prompted his speech. *Id.* And importantly, the listener's "response gave no

indication that she understood [the plaintiff] to be raising broader concerns." *Id.* As a result, the context of the speech demonstrated that the plaintiff was motivated by a private rather than public concern and was thus unprotected. *Id.*

The same is true here. As noted above, after witnessing Town employees improperly using Town property and equipment, Girten never mentioned that he believed the actions violated Town policy, and the listeners did not respond as if they believed Girten was raising anything more than a personal grievance. Moreover, Girten's actions after the incident do not support his argument that he intended to bring to light a breach of the public trust. Indeed, following his March 3 conversation with Poleski and Lewandowski, Girten – like the plaintiff in *Gross* – "took no other corrective measures" to address the Town violation. *Id.* He never raised the issue with Huet or Volkmann, and he never told anyone else at the Public Works Department about the violation, even though the engine remained in the Town garage for almost two weeks after he made his comment to Poleski. *See Phelan v. Cook County*, 463 F.3d 773, 791 (7th Cir. 2006) (plaintiff's unstated motivation irrelevant where "[t]here is no evidence in the record that she complained about the treatment of other women in the Buildings and Grounds Department at any point.").

Even more telling, when Girten finally raised the incident again, the context suggests that he did so for purely personal reasons. Recall that on April 2 (almost a month after witnessing the violation), Girten met with Lewandowski about the broken mailboxes. Lewandowski instructed Girten to immediately fix the mailboxes and placed other restrictions on Girten's employment. Girten was upset by what he perceived as mistreatment. [DE 52-2 at 47-48.] He felt he was being "treated unfairly, as compared to other employees" and responded – seemingly

out of the blue – by telling Lewandowski "that I am going to make a report and turn you in" for allowing the engine to be rebuilt in the Town garage.  [*Id*. at 47-49.]  Girten then threatened Lewandowski and others by telling them to "get yourself an attorney, because I'm going to report this."  [*Id*. at 51.]  He then wrote down what happened on March 3 (along with March 31 and April 2) and tried to report it to the Schererville police department.

Girten admitted that he "blew off some steam" and said some things he shouldn't have said.  [*Id*.]  He also testified that he did not report the March 3 incident until after his blowup with Lewandowski because he "didn't see it as necessary" until then.  [*Id*. at 68.]  But by attempting to report the misuse of Town equipment only in response to what he perceived as unfair treatment and, more importantly, as a means to threaten others while he "blew off steam," the context indicates that Girten was never motivated by public concern in raising the issue, but by purely personal interests.  It appears that Girten took the tack that the best defense is a good offense, and so when he was under attack, he went on the offensive.  This is the best evidence that his motives were less civic minded and more personally motivated  *See Cliff v. Bd. of School Com.'s of City of Indianapolis*, 42 F.3d 403, 410-11 (7th Cir. 1994) (teacher's speech regarding the efficiency and integrity of a high school's operations was of purely private concern where she spoke "only in response to criticism directed to her classroom performance").

Consequently, while the public may have had an interest in knowing that public employees were using Town equipment for personal reasons, the content, form, and context of Girten's comment to Poleski suggests a purely personal matter rather than an attempt to highlight an issue of public concern.  *See Bivens*, 591 F.3d at 561-62.  In sum, Girten's speech is not protected by the First Amendment.  So summary judgment will be granted on this claim.

## II.    ADA Claim

Girten next claims that Schererville's actions violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*[5]  The ADA prohibits disability-based discrimination and has two distinct categories of disability claims – failure to accommodate and disparate treatment.  *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001); *see* 42 U.S.C. § 12112(b).  A failure to accommodate claim requires the plaintiff to show: (1) he is a qualified individual with a disability who could perform the essential functions of the job with or without a reasonable accommodation; (2) the employer was aware of the disability; and (3) the employer failed to reasonably accommodate the disability.  *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008).  To prevail on a disparate treatment claim, a plaintiff must show he is a qualified individual with a disability who could perform the essential functions of the job with or without a reasonable accommodation, and he suffered an adverse employment action because of his disability.  *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008).  Here, Girten seeks relief under both theories.  Because both types of discrimination require Girten to show he's a "qualified individual with a disability," *see Basith*, 241 F.3d at 927, that's where I begin.

### A.    Qualified Individual with a Disability

#### 1.    Individual with a Disability

An individual is disabled under the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such

---

[5]  Congress made significant changes to the ADA that took effect January 1, 2009.  The Seventh Circuit held, however, that the amendments do not apply retroactively, so I apply the ADA, and the relevant case law, as it existed at the time of the relevant events, April 2008.  *See Equal Employment Opportunity Commission v. AutoZone, Inc.*, 630 F.3d 635, 641 n.3 (7th Cir. 2010).

impairment; or (3) is "regarded as" having such an impairment. 42 U.S.C. § 12102(2). Girten alleges that his diabetes rendered him physically and mentally disabled or, in the alternative, the Town regarded him as disabled. I conclude that there is enough evidence for a jury to find that he is correct on both accounts.

First, to determine whether a plaintiff has an impairment that substantially limits a major life activity, I must find: (1) the condition alleged constitutes a physical or mental impairment, (2) the impairment affects a major life activity, and (3) the impairment operates as a substantial limit on the major life activity asserted. *Nawrot v. CPC Int'l*, 277 F.3d 896, 904 (7th Cir. 2002). Girten alleges that his diabetes is an impairment that substantially limits the major life activities of eating and thinking. The parties do not dispute that Girten's diabetes constitutes a physical or mental impairment or that eating and thinking are major life activities. *See Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 923 (7th Cir. 2001) (eating major life activity); *Nawrot*, 277 F.3d 905 (thinking major life activity). So the issue is wether Girten's diabetes substantially limits his ability to do those things.

In determining whether an impairment substantially limits a major life activity, the crucial inquiry is whether the individual is "unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007); *AutoZone*, 630 F.3d at 642. Notably, while the Seventh Circuit has found diabetes a substantially limiting impairment in other cases, "diabetic status, per se, is not sufficient to qualify as a disability." *Nawrot*, 277 F.3d at 904. That's because the analysis requires an

individualized inquiry into each plaintiff's actual condition, rather than a determination about the impairment generally. *Barnham v. Snow*, 392 F.3d 896, 903 (7th Cir. 2004).

Without question, Girten's diabetes is quite serious and a jury could reasonably find that Girten's condition substantially limits the major life activity of eating. Girten's diabetes requires him to severely regulate his diet and food intake to keep his blood sugar within a normal range. He must draw blood at least four times a day to check his blood sugar, and based on his count, adjust his eating and lifestyle habits accordingly, by either eating more or less at any given time. In addition, his blood sugar reading requires him to take at least two insulin shots a day, though that too varies depending on his blood sugar level. His blood sugar also varies based on other factors, like physical exertion or stress, and he must constantly adjust his diet or insulin intake based on these factors. And despite the fact that, by all accounts, Girten worked very hard to keep his blood sugar under control, [*see* DE 52-1 at 53 (Huet: "[Girten] is one of the most regimented diabetics I've ever met")], he was still unable to keep his levels within a healthy range during the relevant period – from January to April 2008. [DE 52-4 at 13-16.] Based on this, Dr. Rybczynski testified to what seems rather apparent: that Type I diabetics like Girten "ha[ve] restrictions on eating that the average person in the general population does not have." [DE 50-4 at 48-49.]

The Seventh Circuit has found similar evidence sufficient to create an issue of fact. In *Barnham*, the Court held that plaintiff's diabetes substantially limited his eating when compared to the average person because "his dietary intake is dictated by his diabetes, and must respond, with significant precision, to the blood sugar readings he takes four times a day." 392 F.3d at 903-04. Similarly, in *Lawson*, the Court found that a plaintiff's diabetes substantially limited his

eating because he always had to concern himself with the availability, type, and timing of his food. 245 F.3d at 924; *see also Amick v. Visiting Nurse and Hospice Home*, 2006 WL 2989277, at *5 (N.D. Ind. Oct. 18, 2006). In sum, Girten has presented sufficient evidence for a jury to find that he was substantially limited in the major life activity of eating.

And the same goes for the major life activity of thinking. According to Girten, when his blood sugar levels destabilize – largely because of increased stress – he is unable to focus on the job, do daily chores, control his mood changes, or sleep. [*See* DE 52-2 at 34-35, 64.] And, again, despite his diligence, Girten was unable to completely control his blood sugars, causing him to miss close to a week of work. Based on this evidence, Girten raises a genuine issue as to whether his diabetes substantially limited his ability to think. *See Nawrot*, 277 F.3d at 904-05 (finding plaintiff disabled because his diabetes impaired his ability to think coherently due to fluctuating blood sugar levels); *Amick*, 2006 WL 2989277, at *5 (same).

Girten has also presented sufficient evidence to show that the Town "regarded" him as having an impairment that substantially limited a major life activity. Under a "regarded as" theory, a plaintiff must prove (1) the employer mistakenly believes the employee has an impairment that substantially limits a major life activity, or (2) the employer mistakenly believes that an existing, nonlimiting impairment, substantially limits a major life activity. *Brunker v. Schwa's Home Service, Inc.*, 583 F.3d 1004, 1008 (7th Cir. 2009).

Prior to Girten's blood sugar problems, the Town knew that Girten had diabetes but never had any problems with Girten or his work. [DE 52-3 at 11.] But on April 2, 2008, Girten told both Lewandowski and Volkmann that his blood sugar was out of control and that he was unable to immediately fix the mailboxes. He told Volkmann he would need some time to

address his high blood sugar, and Volkmann approved the time-off, telling Girten that his absences were covered under the ADA.  Yet when he returned to work a few days later, Volkmann told Girten he was being fired "because of [his] health."  [DE 50-3 at 103-04.]

So here's what a reasonable jury could surmise: at the first sign that Girten's diabetes could significantly impact his work, instead of investigating the matter further to determine what limitations (if any) Girten may have going forward, the Town fired Girten because of his diabetic condition.  Though the Town offers a differing account, reading the evidence in the light most favorable to Girten, this evidence is enough to create a question of fact as to whether the Town mistakenly believed that his diabetes substantially limited a major life activity.

### 2.    Qualified Individual

In addition, the ADA only protects "qualified individuals" with a disability.  A qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  To meet this standard, the employee must (1) satisfy the employer's legitimate selection criteria for the job; and (2) be capable of performing the job's "essential functions" with or without a reasonable accommodation from an employer.  *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005).

The Town argues that Girten fails to meet the second prong of the test because he is incapable of performing the job's essential functions with or without a reasonable accommodation.  This suggestion is a bit galling since in his sixteen years working for the Town, Girten was always a good worker, and his supervisors never had any problems with his work.  In other words, from 1993 to March 2008, Girten adequately performed the job's essential

functions.  Nonetheless, in arguing that Girten now fails to meet that standard, the Town cites to

*Hammel*, in which the Seventh Circuit found that "the ADA does not shelter disabled individuals

from adverse employment actions if the individual, *for reasons unrelated to his disability*, (such

as a poor work ethic, carelessness, bad attitude, insubordination or unprofessional demeanor), is

*not qualified* for the job or is *unable to perform* the job's essential functions or fulfill the

requirements of the position as prescribed by the employer or fails to meet his employer's

expectations."  *Id*. (emphasis in original).  Based on this, the Town claims that Girten is not

capable of meeting the Town's expectations because he was "indisputably and unjustifiably"

insubordinate by refusing to fix the broken mailboxes on March 31 and April 2.  [DE 54 at 5.]  It

also claims that Girten did not meet the Town's expectations because he failed to control a

controllable disease and because he couldn't perform the job's essential functions even with an

accommodation.

But the facts are far from clear.  While the Town claims that Girten was insubordinate

because he refused to fix the broken mailboxes on March 31, Girten testified that he told

Lewandowski that he *would* fix the mailboxes on that date.  [DE 52-2 at 39.]  Who's telling the

truth and who's fibbing is for the jury to decide.

Also, reading the evidence in the light most favorable to Girten, a reasonable jury could

find that Girten was not insubordinate on April 2.  According to Girten, after Lewandowski

instructed Girten to immediately fix all of the broken mailboxes, Girten explained:  "My blood

sugars are outrageously high.  I need more help on this job.  I cannot do it all myself."  [*Id*. at

47.]  This is consistent with Girten's persistent requests over the previous three months for

additional help because of the unusually heavy workload.  Girten's response was not a "flat out

refusal" to fix the mailboxes, which was Huet's reason for recommending Girten's termination, but a plea for help because of the unprecedented uptick in his workload, pressure from his boss, and his destabilized blood sugar.

Moreover, at the time of their confrontation, Lewandowski had no idea how many mailboxes needed to be fixed, and he admitted that if he had known, he would have offered Girten more help from the get-go. But more importantly, after Girten told Volkmann about his "run in with [Lewandowski]," Volkmann told Girten: "Don't worry about it, you take care of your health. You are covered under the ADA for your missed days." [DE 50-2 at 71.] Volkmann's comments suggest that, at that time, he did not believe Girten's actions amounted to insubordination, and, indeed, he excused Girten's absence from work because of his diabetes. Thus, Girten has provided sufficient evidence for a reasonable jury to find that he was not insubordinate on April 2.

Next, the Town's argument that Girten failed to perform the job's essential functions because he was unable to control a controllable disease is off-base. In making this argument, the Town relies on *Siefken v. Village of Arlington Heights*, in which the Seventh Circuit found that a police officer who was fired because he failed to properly control his diabetes could not recover under the ADA. 65 F.3d 664, 667 (7th Cir. 1995). Specifically, the Court held that "when an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet 'the employer's legitimate job expectations,' due to his failure to control a controllable disability, he cannot state a cause of action under the ADA." *Id*. (internal citation omitted). The facts in *Siefken* are miles apart from those presented here. Most notably, the plaintiff in *Siefken* admitted that he did not properly monitor his diabetes. *Id*. at 666. He also

failed to request an accommodation, instead, merely seeking a "second chance" to show that he could adequately monitor his diabetes. *Id*. at 666-67.

By contrast, Girten presents evidence that his diabetes was not controllable, despite his best efforts. Indeed, while he was generally able to keep his blood sugar in check during the years he worked for the Town, he never faced the extraordinary number of mailboxes that needed to be fixed in March and April 2008. This, in combination with the pressure he was receiving from his supervisor, caused Girten's blood sugars to fluctuate out of control, despite his "vigilant" and "regimented" care in monitoring his blood sugar levels. [*See* DE 52 at 32 (Town Motion); DE 52-1 at 53 (Huet Dep.).] In fact, even after consulting Dr. Rybczynski on April 1 and taking extra shots of insulin, Girten's blood sugar was still "sky high" the next day when he reported to work. [DE 52-2 at 45.] Also, unlike the plaintiff in *Seifken*, Girten specifically requested an accommodation – extra help with the high numbers of mailboxes Lewandowski wanted him to immediately fix. So *Seifken* does not mandate dismissal of Girten's ADA claims.

Finally, Schererville argues that because Lewandowski offered Girten an accommodation – one extra worker to help with the mailboxes – and Girten turned it down, Girten could not perform the job's essential functions even with a reasonable accommodation. I disagree. Recall that in January 2008, Girten told Lewandowski and Huet that he needed a crew of workers to help fix the high number of broken mailboxes. In response, Lewandowski gave Girten one helper, for one day. So when Lewandowski once again offered an additional helper on March 31 – without first determining how many actual mailboxes needed to be fixed – it is unsurprising that Girten found the request insufficient, and responded by telling Lewandowski that because of

his "outrageously high" blood sugars, he "needed *more* help on this job."  [DE 52-2 at 47 (emphasis added).]  In fact, Lewandowski later admitted that his initial offer was not up to par when he stated that he would have offered Girten more than one helper had he been better informed.  *See Equal Employment Opportunity Commission v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005) (finding that while an employer is not required to provide an employee their requested accommodation, it must "provide an accommodation that effectively accommodates the disabled employee's limitations.").

As a result, a reasonable jury could find that Girten could have performed the job's essential functions with this reasonable accommodation – more than one helper.  *See Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591, 601 (7th Cir. 1998) ("The reasonableness of a requested accommodation is a question of fact."); *Lenker v. Methodist Hosp.*, 210 F.3d 792, 797 (7th Cir. 2000) ("Whether the hospital tried to reasonably accommodate Lenker with these steps, and whether Lenker cooperated in the hospital's attempts to accommodate him are classic fact questions for the jury to resolve.").  Add all of this up, and Girten has presented enough evidence to create a question of fact as to whether he's a qualified individual under the ADA.

**B.**     **Failure to Accommodate**

Since a reasonable jury could find that Girten is a qualified individual with a disability, I must next determine whether Girten has presented sufficient evidence to show that the Town was aware of his disability and yet failed to reasonably accommodate him.  *See Mobley*, 531 F.3d at 545.  The ADA imposes on an employee the initial duty to inform the employer that he has a disability that requires an accommodation.  *Sears*, 417 F.3d at 803-04.  After this disclosure, the employer must "engage with the employee in an 'interactive process' to determine the

appropriate accommodation under the circumstances." *Id.* at 805 (the interactive process requires "a flexible give-and-take"). The purpose of the interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005). Where a reasonable accommodation is available, but the interactive process fails to lead to the accommodation, "responsibility will lie with the party that caused the breakdown." *Sears*, 417 F.3d at 805.

Here, the Town knew about Girten's diabetes when he started working in 1993. It even accommodated his disease by allowing Girten to bring to work a small refrigerator to store extra food and insulin. The Town claims, however, that because it was unaware of Girten's diabetes-related stress and his elevated blood sugars, it had no duty to accommodate here. Indeed, it argues that Girten never told anyone about his health problems until after he was insubordinate. And, in any event, because Girten knew about his stress throughout March 2008, he was responsible for any breaking down in the interactive process.

These arguments fail. First, on April 2, Girten made very clear that his diabetes was adversely affecting his work, and he requested an accommodation. He explained to Lewandowski that he could not immediately fix the mailboxes without more help because his blood sugar was outrageously high. [DE 52-2 at 47.] Girten then told Volkmann – the Town's decision-maker – on April 2 and again on April 8, that workplace stress was causing his unhealthy blood sugar levels. [DE 50-2 at 71; DE 50-3 at 103.] Thus, a reasonable jury could find that Girten, a known diabetic, informed the Town that his diabetes was out of control ("my blood sugars are outrageously high"), it affected his job ("I cannot do this all myself"), and he

needed an accommodation ("I need more help").  *Sears*, 417 F.3d at 803 ("This initial duty [to inform], however, requires at most that the employee indicate to the employer that she has a disability and desires an accommodation.").  And even if Girten's statements were ambiguous as to the precise nature of his disability or desired accommodation, at the very least, he put the Town on notice that he needed assistance.  At that point, the Town had a duty to ask Girten to clarify his need.  *Id*. at 804 (finding that if the employee's request is ambiguous, "an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance" but instead "must ask for clarification").

Because the Town was (or should have been) aware that Girten requested an accommodation because of his diabetes, and it does not claim that no reasonable accommodation existed, it had a duty to engage in an "interactive process."  *Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002) (where a reasonable accommodation exists, the burden shifts to the employer to initiate the process).  But it did nothing.  Accepting Girten's version of events as true, after learning that Girten was unable to immediately fix the mailboxes because of his high blood sugar, it unceremoniously fired him "because of his health," without ever attempting to discuss options that would accommodate his disability.  A reasonable jury could thus find that the Town's decision to fire Girten without first engaging in the interactive process violated its duty to reasonably accommodate Girten's disability.  *See Sears*, 417 F.3d at 805 ("A party that fails to communicate, by way of initiation or process" is responsible for "a breakdown in the process").

## C.    Disparate Treatment

Finally, I turn to Girten's disparate treatment claim.  Under the ADA, an employer may not discharge a qualified individual with a disability "because of the disability of such

individual." 42 U.S.C. 12112(a); *Garg*, 521 F.3d at 736. The Seventh Circuit recently explained that this means "a plaintiff complaining of discriminatory discharge under the ADA must show that his employer would not have fired him *but for* his actual or perceived disability." *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) (emphasis added). Here, having found that Girten is a qualified individual with a disability, I must determine whether a reasonable jury could conclude that Girten's disability was "a but-for cause" of his termination. *Id.* at 963.

Girten proceeds under the direct method of proof, which is "evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Rudin v. Lincoln Land Cmty. College,* 420 F.3d 712, 720 (7th Cir. 2005) (citing *Eiland v. Trinity Hosp.,* 150 F.3d 747, 751 (7th Cir. 1998)). Here, on March 28, 2008, Huet instructed Lewandowski to make sure that Girten made progress on the broken mailboxes. But when Girten met with Lewandowski three days later, Girten told Lewandowski that his diabetes prevented him from immediately fixing the broken mailboxes without more help. He then missed about a week of work because of high blood sugar. During that time Huet and Lewandowski recommended Girten's termination. Upon returning to work, Girten told Volkmann about his health problems and how they have affected his work. According to Girten's testimony, Volkmann responded by firing Girten "because of your health and because of your insubordination." [DE 50-2 at 103-04.] This is direct evidence that the Town fired Girten because of his diabetes.

The Town claims that Girten fails to show but-for causation because Girten admits he was fired for insubordination. Not so. First, as I explained above, a question of fact exists as to

whether Girten was even insubordinate. In any event, Girten's diabetes need not be the *sole cause* of his termination to be the but-for cause. *See United States v. Hatfield*, 591 F.3d 945, 948 (7th Cir. 2010) (defining a "but-for" cause as a "necessary condition"); *United States v. Dyer*, 216 F.3d 568, 570 (7th Cir. 2000) ("'But for' causation is a very weak sense of causation" and "[i]t is poles apart from 'sole cause'"); *see also Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999) (finding that under the ADA's "'but-for' liability standard . . . a disability [must] be shown to be a determinative, rather than the sole, decision-making factor."); *Jones v. Oklahoma City Schools*, 617 F.3d 1273, 1277-78 (10th Cir. 2010) (same under ADEA).

It's important to keep in mind that at this point Girten does not need to prove but for causation. He need only provide evidence from which a reasonable jury could find but for causation. *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1115 (7th Cir. 2009) (ADEA case). And his testimony does just that. *See Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009) ("The record has evidence from which a reasonable jury could find [but-for] causation; no more is necessary at this stage"); *Ray v. Forest River, Inc.*, 2010 WL 3167426, at *7-8 (N.D. Ind. Aug. 10, 2010) (same). The jury must decide whether his diabetes or his insubordination was the but-for cause of Girten's termination. As a result, Girten's discriminatory treatment claim survives summary judgment.

With that said, Girten's ADA claims cannot proceed against Volkmann, Huet, and Lewandowski. The ADA only provides relief for employer liability, and because supervisors are not considered employers under the Act, they cannot be held liable in their individual capacity under the ADA. *Silk v. City of Chicago,* 194 F.3d 788, 797 n. 5 (7th Cir. 1999). So to the extent Girten seeks relief under the ADA against Volkmann, Huet, and Lewandowski in their individual

capacities, his claims are dismissed.

**CONCLUSION**

For the foregoing reasons, Schererville's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. Girten's 42 U.S.C. § 1983 First Amendment retaliation claim is **DISMISSED**. Girten's ADA claims for failure to accommodate and disparate treatment survive against the Town of Schererville, but the ADA claims against Volkmann, Huet, and Lewandowski are **DISMISSED**. [DE 41.] The Town's Motion to Strike Plaintiff's Errata Sheet is **DENIED** as moot. [DE 53.]

**SO ORDERED**.

ENTERED: May 2, 2011.

s/ Philip P. Simon
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT